736 S.W.2d 787 (1987)
MAGCOBAR NORTH AMERICAN, A DIVISION OF DRESSER INDUSTRIES, INC. and Oso Refining Company, d/b/a Apache Fuel & Supply Co., Appellants,
v.
GRASSO OILFIELD SERVICES, INC., Appellee.
No. 13-86-163-CV.
Court of Appeals of Texas, Corpus Christi.
June 30, 1987.
Rehearing Denied August 28, 1987.
*791 J. Michael Mahaffey, David M. Coover, Jr., Corpus Christi, Robert M. Hardy, Jr., Warren R. Taylor, Houston, Mike A. Hatchell, Tyler, for appellants.
Edward O. Garcia, Corpus Christi, for appellee.
Before NYE, C.J., and KENNEDY and DORSEY, JJ.

OPINION
KENNEDY, Justice.
This is an appeal from an action for damages arising out of the breach of an alleged lease. Grasso Oilfield Services, Incorporated, sued Magcobar North American Division and Apache Fuel & Supply Company after Apache replaced Grasso in doing business with Magcobar. Grasso alleged in its petition that it owned a six-year lease on a dock controlled by Magcobar, that Magcobar breached the lease, and that Apache tortiously interfered with the lease. After a lengthy trial, a jury found favorably to Grasso on all of twenty-nine special issues. The trial court rendered judgment on the verdict, awarding Grasso $2,500,000 in lost profits, $150,000 in reliance damages, and exemplary damages of $3,750,000 against Magcobar and $1,250,000 against Apache.
*792 I. THE MAGCOBARGRASSO ARRANGEMENT
Most of the facts are not disputed. In late 1979 or early 1980, Lee Williams, who was at that time Magcobar's area distribution manager for the Corpus Christi area, began looking for property to develop. Magcobar intended to expand its facilities in the Corpus Christi area for selling drilling fluids and chemicals to the offshore oil industry. During this period, Williams began negotiating with American Petrofina (Fina) to lease part of the land Fina owned on Harbor Island, near Port Aransas and the mouth of the Corpus Christi Ship Channel.
William Guy DeLay became president of Grasso in April 1980. DeLay, a friend of Lee Williams, had known of Magcobar's desire to develop an offshore service business in the Corpus Christi area since 1979. He was interested in Magcobar's plans because Grasso and Magcobar were in business together at other offshore service points. At these other locations, Magcobar would supply oilfield service boats with drilling fluids and chemicals, and Grasso would supply them with diesel fuel and lubricants. This created "full-service docks" where the service boats could get all the supplies they needed at one place.
Magcobar leased land on Harbor Island on January 1, 1982, and began planning construction of its dock. Construction actually began in October 1982 and was completed in May 1983. Grasso became involved during the summer or fall of 1982, negotiating with Magcobar in order to obtain the fuel-selling concession on Magcobar's dock.
On October 5, 1982, DeLay sent Williams a letter with Grasso's proposal. In the letter, Grasso proposed that it would supply Magcobar's customers with diesel fuels and lubricants. It would use Fina as its diesel supplier, as Fina (the land owner) desired, and it would buy or lease a warehouse to store its lubricants and attempt to rent a fuel storage tank from Fina to store its diesel. Grasso further offered to pay for all costs of laying pipelines, pumps, and other necessary equipment, to comply with all governmental and corporate regulations, to carry adequate insurance, and to use qualified staff. Williams forwarded a copy of this letter to Fina on November 14, 1982, along with a cover letter which stated that the Grasso proposal was "along the lines that we at Magcobar would prefer to follow." Williams also requested a meeting with Fina to "discuss this proposal and any other alternatives you suggest."
As construction continued at Harbor Island, Magcobar engineers contacted Grasso in January 1983 for permission to lay the pipeline from the Fina tank to the edge of the dock. Magcobar wanted to lay the pipe themselves for time and cost efficiency, since it was preparing to pour the dock's concrete slab. The pipeline was to be encased in the slab, so it would be out of the way. Grasso approved Magcobar's laying the pipeline. In April 1983, Grasso leased a warehouse in nearby Aransas Pass to store its lubricants. In May 1983, DeLay called Williams, told him that Grasso had a supply agreement with Fina, and asked for permission to move its equipment onto the dock. The request was approved by William B. Corser, president of Magcobar, and Grasso came on the dock and became operational.
As of May 1983, when the full-service facility opened for business, no written agreement between Grasso and Magcobar existed. DeLay and Williams orally agreed that, since Grasso had entered a burdensome fuel-supply contract with Fina, and since the market was new and untested, they would sit down and negotiate a written lease when the operation became profitable. In the meantime, it was agreed that Grasso would not pay Magcobar the standard "put-through" commission, which was the primary rent charged a diesel fuel retailer in the industry, computed on a cents-per-gallon-sold basis.[1] Grasso did, however, pay $175 per month as rent for a *793 trailer which it located on the dock and used as an office and as sleeping quarters for its employees. Grasso further agreed to provide a full-service dock, open seven days a week, twenty-four hours a day.
On June 1, 1983, Magcobar changed its personnel structure from an "area" concept to a "district" concept. Lee Williams was transferred to Houston to act as District Manager of the Houston district, and Orville Welch became District Manager of the Corpus Christi district, with responsibility over the Harbor Island facility. Near the beginning of July 1983, Gary D. Shields, general attorney for the Magcobar Group of Dresser Industries, first learned that no written agreement existed covering the Grasso-Magcobar arrangement at Harbor Island. He immediately called Lee Williams, who told Shields that Magcobar had needed Grasso on the dock for their grand opening and would work out a full agreement when Grasso reached profitability. The parties disagreed at trial on whether "profitability" meant a single successful month (November 1983) or when profits exceeded costs for the entire operation (January or March 1984).
At any rate, no mention was made between the parties of reducing the arrangement to a writing until January 1984, when DeLay casually remarked to Williams, at the end of a meeting on other matters, that January 1984 looked like it would be a good month, so they ought to get together and work out a contract. DeLay was fired near the end of that month, and James Moxon became Grasso's president. After this, neither DeLay nor Williams, the two friends who had coordinated the dock arrangement, had any authority over the Harbor Island operation.
Once again, the arrangement at Harbor Island continued undisturbed until about April 1984. During the first part of April, Moxon of Grasso met with Magcobar's Williams and Ken Beerman, Williams' supervisor. Magcobar requested a written indemnity agreement from Grasso, which Grasso promised to prepare. At the same time, Gary Shields and his supervisor in Magcobar's legal department were becoming increasingly nervous about the lack of a written contract covering the Harbor Island operation. On April 15, 1984, Grasso sent to Magcobar a document entitled "Fuel Dispensing Agreement," which contained an indemnity agreement but also dealt with other matters. It made no provisions for a cent-per-gallon commission. This document was received by Shields on May 7. Shields apparently treated it as a proposed integrated contract to cover the entire Magcobar-Grasso operation on Harbor Island.
Meanwhile, Orville Welch, Magcobar's district manager over Harbor Island, noticed that the Harbor Island facility was deriving no income from Grasso's diesel fuel sales, whereas a similar facility at Sabine Pass was producing income for Magcobar. Also during the month of April, Magcobar learned that Grasso had been discussing with Fina the possibility of leasing the remainder of Fina's waterfront land on Harbor Island, and had been talking to Magcobar's competitors, Newpark and Baroid, about participating in this venture. Magcobar became upset, and Grasso offered participation to Magcobar, but Magcobar apparently decided against participating in these expansion plans. Grasso proceeded to enter into an agreement with Fina dated May 1, 1984, tying up the rest of Fina's waterfront land and substantially reducing the rent Fina was charging under the May 1983 fuel supply agreement.
About May 7, 1984, several Magcobar executives, including Williams, Beerman, Shields, and Orville Welch, had an informal meeting. Welch raised the issue of Harbor Island, wondering if there was a way to profit from the diesel fuel sales there. Shields agreed with Welch that Magcobar should be making money from the fuel sales there. Within the next day or two, Welch had called representatives of four diesel fuel retailers, including Apache, inviting them to submit proposals to Magcobar, letting Magcobar know how much the fuel concession at Harbor Island would be worth to those companies. He received proposals from all four companies.
*794 Despite Magcobar's solicitation of these proposals, it was determined that Grasso would be given a face-to-face meeting to discuss the rent it would be willing to pay. Moxon, on behalf of Grasso, attended a meeting May 29, 1984, in Magcobar's offices. Shields, Beerman, and Welch were present on Magcobar's behalf. The accounts of the proceedings at this meeting vary.
Shields had already prepared a contract entitled "Dock Use Agreement" for Moxon to sign which included Grasso paying a rental fee of five cents per gallon for the first 500,000 gallons sold, and 7.5 cents per gallon thereafter, in addition to a $2,000 flat monthly rental. Moxon considered these terms "outlandish" and told the others that Grasso couldn't afford to pay more than one-half-cent per gallon, without the flat rate. One of the Magcobar representatives then advised Grasso that it would have to submit a bid along with competitors if it wanted to continue as the fuel operator at Harbor Island. Moxon terminated this brief meeting by leaving.
On June 5, 1984, Moxon wrote Shields regarding the "Dock Use Agreement" proposed at the May 29 meeting. He reiterated that Magcobar's proposed agreement was unacceptable and wrote that, due to high costs from its supply contact with Fina, Grasso could not offer more than one-half-cent per gallon as rental.[2] Moxon requested another personal meeting to discuss the proposal; however, Shields treated the letter as a bid and only responded to advise Moxon that its bid was unsuccessful, that Apache's bid had been accepted, and that Grasso was to vacate the dock.

II. APACHE'S ROLE IN THE DISPUTE
Apache Fuel & Supply Company had been interested in operating an offshore diesel fuel concession in the Corpus Christi area since early in 1984. Jerry Lewis Susser, vice-president of Apache, testified that Apache had unsuccessfully negotiated for such a concession with Newpark and Baroid, two of Magcobar's competitors in the area, during February or March of 1984. However, Susser had been aware of Grasso's operation, simply as a man in the business, since the Magcobar dock first opened in May 1983. "And then when I started seeing all these great big boats pulling up there, I started drooling," Susser testified.
Briggs O. Beadle, Apache's president, got the call from Orville Welch of Magcobar inviting Apache to submit a proposal. Beadle testified that, about May 7, 1984, Welch called him "out of the blue." Beadle asked how much fuel was being sold by Grasso and was told about 600,000 to 700,000 gallons per month. He then computed, off the top of his head, a two-cent-per-gallon commission to Magcobar as being close to what he would offer for the concession. During or shortly after the call, Beadle wrote these figures on a note pad. Beadle testified that he had not spoken to Welch previously about the concession, except about two years earlier when Beadle saw Welch socially and inquired about the fuel concession at Harbor Island. Welch told him Grasso had it, and Beadle "let it go" after that.
After the June 12, 1984, bid deadline that Magcobar had established, Apache's bid was tentatively accepted. Apache and Magcobar entered negotiations, and on June 22, 1984, reached some form of agreement. However, a written contract was not fully executed until August 23, 1984. Grasso was given until September 22, 1984, to remove itself from Magcobar's dock, but it did not leave until November 6. Magcobar had won final judgment against Grasso in a forcible entry and detainer suit in county court on November 1, 1984, and Grasso spent five days removing its equipment. Apache went into possession of the Magcobar dock on November 6.
Grasso filed suit against Magcobar and Apache in district court on August 13, 1984, alleging an oral contract which coincided with its supply agreement with Fina. That agreement provided for a two-year primary term, commencing April 1, 1983, *795 and for two options for Grasso to extend the contract for two years. Grasso wrote Magcobar on December 14, 1984, and notified Magcobar that it was exercising both of its options under the alleged oral lease.

III. THE LEGAL ISSUES
In this appeal, Magcobar and Apache both challenge the existence of a binding lease between Magcobar and Grasso. They characterize the relationship as merely an agreement to negotiate a writing in the future, and assert the statute of frauds as a defense. See Tex.Bus. & Comm.Code Ann. § 26.01 (Vernon 1968 Supp.1987). Appellants raised these issues at trial by motions for directed verdict and for judgment notwithstanding the verdict. Grasso readily admits that no written lease was ever executed. It asserts, however, that equity bars the operation of the statute of frauds, because Magcobar is estopped to deny the existence of a lease, and because of part performance by Grasso.
The jury, in answer to some of the special issues submitted, found the following. Lee Williams, acting with implied and apparent authority, entered into an agreement to allow Grasso to operate the fuel concession for the same term as the Grasso-Fina supply agreement: April 1, 1983, to March 31, 1989. Although Magcobar agreed to sit down and negotiate a reasonable cent-per-gallon rate and a written contract as soon as Grasso's operation reached a profitable level, Magcobar later refused to negotiate in good faith and refused to reduce the parties' agreement to writing. These findings are supported by evidence from James Moxon that Magcobar and Grasso agreed to "dovetail" their concession agreement with the supply agreement between Grasso and Fina, as well as by the uncontroverted evidence recited above.
The jury also found, as argued by Grasso, that Magcobar was estopped to deny the existence of a lease. Magcobar and Apache assert that no evidence exists to support this finding.
A promise which should reasonably be expected to induce action or forbearance of action, and which does in fact induce definite and substantial action or forbearance, will be enforced if injustice can only be avoided by enforcement of the promise. Fretz Construction Co. v. Southern National Bank, 626 S.W.2d 478, 480 (Tex.1981); "Moore" Burger, Inc. v. Phillips Petroleum Co., 492 S.W.2d 934, 938 (Tex.1972). A promise to make a writing that complies with the statute of frauds is also enforceable in order to avoid an unjust result. "Moore" Burger, 492 S.W.2d at 937; Retama Manor Nursing Centers v. Cole, 582 S.W.2d 196, 200 (Tex. App.Corpus Christi 1979, writ ref'd n.r. e.); see Cobb v. West Texas Microwave Co., 700 S.W.2d 615, 616 (Tex.App.Austin 1985, writ ref'd n.r.e.); First State Bank v. Schwarz Co., 687 S.W.2d 453, 455 (Tex. App.Dallas 1985, writ ref'd n.r.e.).
Magcobar in effect admits, in one of its supplemental briefs, that it promised to sign a writing. Its contention is that the essential terms to be included in the writing were yet to be negotiated; therefore Magcobar and Grasso merely had a contract to sign a contract, which is unenforceable. There is sufficient evidence in this case to support the jury's finding of an agreement between the parties. There is evidence of an agreement as to all essential terms, see Retama Manor, 582 S.W.2d at 200, except price.
Parties may reach an agreement on some contract terms and leave other portions to be agreed upon later. Scott v. Ingle Bros. Pacific, 489 S.W.2d 554, 555 (Tex.1972); Frank B. Hall & Co. v. Buck, 678 S.W.2d 612, 629 (Tex.App.Houston [14th Dist.] 1984, writ ref'd n.r.e.), cert. denied, 472 U.S. 1009, 105 S.Ct. 2704, 86 L.Ed.2d 720 (1985). Moreover, where a price term is left open, the law presumes that a reasonable price was intended. Bendalin v. Delgado, 406 S.W.2d 897, 900 (Tex. 1966); Hydro-Line Manufacturing Co. v. Pulido, 674 S.W.2d 382, 387 (Tex.App. Corpus Christi 1984, writ ref'd n.r.e.).
This price may be determined by the fact finder. Hydro-Line, 674 S.W.2d at 387. In this case, the jury supplied the missing term by finding one cent per gallon *796 a reasonable commission, or rent, for the lease. If a writing which omits essential terms, because they are to be agreed upon later, is enforceable as a contract, we see no good reason why estoppel may not be grounded upon a promise to sign a writing where the promise is made in contemplation of future determination of a reasonable price. This case thus differs from Gerdes v. Mustang Exploration Co., 666 S.W.2d 640, 644 (Tex.App.Corpus Christi 1984, no writ), where the price term was held to be "the essence of the proposed contract."
Where an estoppel to assert the statute of frauds has been established, the party who detrimentally relied on the promise is entitled to reliance damages, which would put the party in the position it would have been in had it not acted in reliance, rather than lost profits. Fretz Construction Co., 626 S.W.2d at 483; Wheeler v. White, 398 S.W.2d 93, 97 (Tex.1965); Kenney v. Porter, 604 S.W.2d 297, 303 (Tex. Civ.App.Corpus Christi 1980, writ ref'd n.r.e.). The jury in this case found that Grasso had suffered $150,000 in reliance damages. This finding is unchallenged by Magcobar and therefore is binding on us.
Apache asserts that the trial court's judgment erroneously held Apache jointly and severally liable, with Magcobar, for Grasso's $150,000 reliance damages. We agree. The jury found the $150,000 as "[a]ny damages, other than loss of profits, suffered by Grasso in reliance upon its agreement with Magcobar." Any expenses borne by Grasso in reliance on its agreement necessarily were incurred in connection with moving onto and off of the dock. No evidence was introduced of other damages. Apache may not be held liable for the expenses incurred before its tortious interference. Since this issue did not segregate the damages in any way, the trial court erred in charging Apache for that amount.
In support of its judgment for $2,500,000 in lost profits, Grasso asserts that the doctrine of partial performance takes this alleged lease out of the statute of frauds. Three elements must be established to satisfy the doctrine: (1) payment of consideration, whether in money or services; (2) possession by the transferee; and (3) valuable and permanent improvements made by the transferee with the transferor's consent. Sharp v. Stacy, 535 S.W.2d 345, 347 (Tex.1976); Fluellen v. Young, 664 S.W.2d 776, 781 (Tex.App.Corpus Christi 1983, no writ). Whether sufficient partial performance has occurred is a question of fact. Fluellen, 664 S.W.2d at 781.
Magcobar contends that no evidence supports the jury finding that Grasso "constructed or had constructed valuable and permanent improvements on Magcobar's Harbor Island premises." We agree. The only evidence of a valuable and permanent improvement, according to all of the parties and the evidence, is the underground pipeline which was laid from the Fina supply tank to the dock. Grasso connected fuel pumps, meters, hoses, and other equipment to this pipeline. All of this equipment was removed, however, along with Grasso's trailer, when it left the dock.
Grasso had offered to pay for the cost of laying the supply line from the Fina tank when it submitted its original proposal to Magcobar. Later, the parties agreed that Magcobar would install the pipeline as part of its dock construction and bill Grasso for that cost later. Magcobar even went so far as to separate the pipeline cost from other construction costs in January 1984, but it never billed Grasso. Grasso neither paid nor tendered payment for Magcobar's laying the pipeline. Under this undisputed evidence, no valuable and permanent improvements were made by Grasso.
Our holding that Grasso may recover reliance damages, but may not recover damages for breach of contract, is consistent with equity, the principle underlying all exceptions to the statute of frauds. The legislature has directed that courts enforce the promises contained in Tex.Bus. & Comm.Code Ann. § 26.01(b) only if they are in writing. Nagle v. Nagle, 633 S.W.2d 796, 799 (Tex.1982). Adherance to this command by the courts, except in cases where equity clearly demands an avoidance, *797 gives business people a firm rule by which they can transact their affairs with a reasonable amount of certainty as to the consequences of their actions. This rule should not be disregarded where, as here, the plaintiff is able to recover any losses it sustained by acting in reliance on what it considered an agreement, and has the opportunity to continue its business on adjoining land.
Even though breach of contract damages are not recoverable in this case, Grasso contends that the award of lost profits against Magcobar is supported by the jury finding that Magcobar interfered with Grasso's peaceful possession of the premises. This is a tort finding on Grasso's cause of action for wrongful eviction, independent of its breach of contract claim. The finding is also supported by the jury's findings that Magcobar agreed to the material terms of the lease but refused to negotiate in good faith and reduce the agreement to a signed writing.
Generally, lost profits are recoverable as damages for wrongful eviction where proved with reasonable certainty. Birge v. Toppers Menswear, 473 S.W.2d 79, 85 (Tex.Civ.App.Dallas 1971, writ ref'd n.r.e.). In reply, Magcobar contends that a prior judgment in its forcible entry and detainer suit barred the submission of that issue to the jury. However, the rule is settled that successful prosecution of a forcible entry and detainer suit does not bar a later action for wrongful eviction. Sims v. Century Kiest Apartments, 567 S.W.2d 526, 532 (Tex.Civ.App.Dallas 1978, no writ); Johnson v. Highland Hills Drive Apartments, 552 S.W.2d 493, 494 (Tex.Civ.App.Dallas 1977), writ ref'd n.r.e. per curiam, 568 S.W.2d 661 (Tex. 1978); see Tex.Prop.Code Ann. § 24.008 (Vernon Supp.1987); see also Tallwater v. Brodnax, 137 Tex. 604, 156 S.W.2d 142, 144 (Tex.Comm'n App.1941, opinion adopted) (construing predecessor to section 24.008). We hold that Magcobar may be held liable to Grasso for lost profits proved with reasonable certainty, under Grasso's cause of action for wrongful eviction.
We turn now to Magcobar's and Apache's points of error contending that special issues 13, 14, and 15 were improper comments on the weight of the evidence.[3] Special issues must be worded so as to avoid assuming the truth of a material controverted fact. Alvarez v. Missouri-Kansas-Texas Railroad, 683 S.W.2d 375, 377 (Tex.1984); see Baker Marine Corp. v. Moseley, 645 S.W.2d 486, 489-90 (Tex.App.Corpus Christi 1982, writ ref'd n.r.e.); Tex.R.Civ.P. 277. Complaints *798 concerning any portion of a charge must be reviewed by an examination of the entire charge. Briseno v. Martin, 561 S.W.2d 794, 796 (Tex.1977); Hydro-Line Manufacturing Co. v. Pulido, 674 S.W.2d 382, 388 (Tex.App.Corpus Christi 1984, writ ref'd n.r.e.). Every implied comment on the evidence in a jury issue is not always reversible error; it must be one that would probably cause the rendition of an improper judgment. Alvarez, 683 S.W.2d at 377; Hydro-Line, 674 S.W.2d at 388; Tex.R.App.P. 81. We determine whether "harmful" error occurred by looking to the circumstances of the particular case and the court's charge as a whole.
Appellants complain of several portions of issues 13, 14, and 15. In issues 13 and 14, the use of the phrase "interference with Grasso's peaceful possession of the premises" is not harmful error. Issue 13 submits the question of Magcobar's and/or Apache's interference as a controlling fact question on Grasso's causes of action for wrongful eviction against Magcobar and tortious interference against Apache. While not a model submission, and though "peaceful" could arguably have been omitted, the overall effect was not, in our opinion, so prejudicial as to confuse or mislead the jury. See Pan-Am Foods, Inc. v. Perez, 386 S.W.2d 316, 320 (Tex.Civ.App.Corpus Christi 1964, writ ref'd n.r.e.).
Issue 14 was submitted conditionally in two ways. The jury was instructed to answer issue 14 only if it had answered issue 13 affirmatively. Additionally, the issue asked if the interference, if any, was done with actual malice. As such, no reversible error occurred. Briseno v. Martin, 561 S.W.2d 794, 797 (Tex.1977); Coronado Transmission Co. v. O'Shea, 703 S.W.2d 731, 736 (Tex.App.Corpus Christi 1985, writ ref'd n.r.e.).
Appellants Magcobar and Apache also complain that issue 15 improperly assumes the existence of two disputed facts: Grasso's right to possession of the Harbor Island premises and the term of the alleged lease. Specifically, appellants assert that issue 15 improperly asks the jury (1) to find damages caused by Grasso being deprived of its right to operate a business on Harbor Island; and (2) to compute loss-of-profits damages through March 31, 1989, which coincides with the lease term alleged by Grasso.
We initially note that both of these issues were central to the parties' dispute at trial. However, issue 15 did instruct the jury to find damages, if any, that Grasso sustained. The jury had already determined, in issue 1, whether any agreement existed at all, and whether the lease would run for the term alleged by Grasso. Thus, the very facts which appellants here contend were assumed by the trial court, in submitting issue 15, were earlier submitted for the jury's determination. Under these circumstances, and in view of the charge as a whole, we do not find that the wording of issue 15 constitutes reversible error. See Mason v. Yellow Cab & Baggage Co., 153 Tex. 344, 269 S.W.2d 329, 331 (1954); Texas Employees Insurance Association v. McKay, 146 Tex. 569, 210 S.W.2d 147, 149 (1948). The purpose of issue 15 was for the jury to assess any damages it found. The incidental reference to Grasso's "right" to the premises in the body of the issue was at most a harmless comment on the weight of the evidence. See Alvarez, 683 S.W.2d at 377-78.
Regarding the use of the date March 31, 1989, the trial court had to use some date for the jury to use in determining damages. If the jury found that damages for lost profits were to be assessed, it necessarily had to have accepted Grasso's contention that Magcobar had agreed to a lease. We fail to find reversible error in the use of this date.
Magcobar and Apache also contend that the trial court improperly submitted special issues 10, 11, and 12 because they are irrelevant and are improper comments on the evidence. The jury was asked:

SPECIAL ISSUE NO. 10
Do you find from a preponderance of the evidence that when GRASSO'S operations became profitable, that Magcobar refused to negotiate in good faith with
*799 GRASSO a reasonable cent per gallon rate that Grasso would pay Magcobar for the sale of fuel across its docks?
The jury answered, "We do."
The jury was instructed to answer issues 11 and 12 only if it gave an affirmative answer to any of the numerous sub-issues within Special Issue No. 1.[4] The jury was asked:

SPECIAL ISSUE NO. 11
Do you find from a preponderance of the evidence that Magcobar refused to reduce the fuel service agreement between GRASSO and Magcobar to written form signed by the parties?
The jury answered, "We do."

SPECIAL ISSUE NO. 12
Find from a preponderance of the evidence what a reasonable cent per gallon rate would be for Grasso to pay Magcobar for Grasso's fuel sales across Magcobar's dock at Harbor Island between April 1, 1983 and March 31, 1989 (emphasis added)?
The jury answered, "$.01."
Issue 10 is not irrelevant, as contended by appellants. While not necessarily a controlling or ultimate issue, submission of the question regarding Magcobar's good faith attempts at negotiation was not reversible error. Neither do we find reversible error in the submission of issue 11. Conditioned as it was on an affirmative response to any part of issue 1, the jury had already found some form of agreement between Magcobar and Grasso. Finally, issue 12 is neither irrelevant nor an improper comment on the weight of the evidence. Although the jury is asked to make a finding based on the six-year term alleged by Grasso but denied by both Magcobar and Apache, a finding on a reasonable commission was necessary for the jury to properly assess damages. The period of time used as a reference could be seen as adopting Grasso's contentions as fact, but the trial court could properly have used this term to give the jury a reference point for determining reasonable commission rates for the parties. Inclusion of the specific period of time was not of itself so prejudicial as to be reversible error. See Hydro-line Manufacturing Co. v. Pulido, 674 S.W.2d at 388.
Magcobar and Apache next attack the propriety of the award of punitive damages against them. Magcobar contends that, as a matter of law, it is not liable for punitive damages because Grasso alleged a contract cause of action. However, Grasso also pleaded a cause of action for wrongful eviction against Magcobar. Where actual malice is found by the jury, punitive damages are recoverable in a wrongful eviction case. See Clements v. Withers, 437 S.W.2d 818, 822 (Tex.1969).
Magcobar and Apache also assert that no evidence exists of their actual malice, so that punitive damages are not recoverable. Actual malice was defined in the charge consistent with Clements v. Withers, 437 S.W.2d at 822; that is, "ill will, spite, evil motive, or for the purpose of injuring another." Actual malice need not be proved by direct evidence, but may be inferred by the jury from other facts proved. Moran Utilities Co. v. Childs, 392 S.W.2d 536, 538 (Tex.Civ.App.Beaumont 1965, writ ref'd n.r.e.). Actual proof of ill will or evil motive is not necessary. Malice may be implied by showing a wrongful act which intentionally violates another's right. See Accent Builders v. Southwest Concrete Systems, 679 S.W.2d 106, 111 (Tex. *800 App.Dallas 1984, writ ref'd n.r.e.); Tennessee Gas Transmission v. Moorhead, 405 S.W.2d 81, 86 (Tex.Civ.App.Beaumont 1966, writ ref'd n.r.e.). Nevertheless, to find actual malice from mere intentional violation of another's rights, the jury must have inferred that such violation by Apache was done with "ill will, spite, evil motive, or for the purpose of injuring another," as correctly instructed by the trial court.
In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well-established test set forth in Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex.1986); Dyson v. Olin Corp., 692 S.W.2d 456 (Tex.1985); Glover v. Texas General Indemnity Co., 619 S.W.2d 400 (Tex.1981); Garza v. Alviar, 395 S.W.2d 821 (Tex.1965); Allied Finance Co. v. Garza, 626 S.W.2d 120 (Tex.App.Corpus Christi 1981, writ ref'd n.r.e.); and Calvert, No Evidence and Insufficient Evidence Points of Error, 38 Texas L.Rev. 361 (1960).
The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. As trier of fact, the jury is the judge of the facts proved and may also draw reasonable inferences and deductions from the evidence adduced. Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d 547, 549 (1962); Weaver v. Brink, 613 S.W.2d 581, 584 (Tex.Civ.App.Waco 1981, writ ref'd n.r.e.); Garza v. Anderson, 417 S.W.2d 368, 370-71 (Tex.Civ.App.Corpus Christi 1967, no writ).
The jury heard evidence, on the one hand, that Magcobar attempted to negotiate with Grasso over a reasonable cent-per-gallon commission, at least at the May 29, 1984, meeting. When this failed, Magcobar decided to accept bids on the retail fuel concession, in a legitimate bid process including Grasso, based on the proposals it had received. Magcobar had never voiced any complaints about Grasso's performance. On the other hand, testimony was heard that Apache knew of Magcobar's facility since it opened and had been interested in breaking into the Harbor Island market since at least February or March of 1984. Susser frankly stated that he "started drooling" when he saw all the big boats pulling up for fuel. Magcobar called Apache for a proposal three weeks before it sat down to negotiate with Grasso. At the May 29 meeting, despite having the proposals of Apache and possibly other of Grasso's competitors, Magcobar called for a price of five cents per gallon and seven-and-one-half cents per gallon from Grasso, plus a $2000-per-month flat rental, far in excess of any offers Magcobar had received. Moxon testified that the terms offered were "outlandish" and that he was handed the document by Shields, who simply told him, "Well, we have reduced the dock use agreement to writing and here it is, read it." In addition, Magcobar had just learned the month before that Grasso was leasing Fina's land all around Magcobar's dock. Magcobar refused to participate in developing that land, though they were "extremely upset" that Grasso had talked to competitors of Magcobar before talking to Magcobar.
Having first considered only the evidence favorable to Grasso, we conclude that there is some evidence to support the jury's findings of actual malice by both Apache and Magcobar. The evidence that Magcobar had talked to Apache and received a proposal before talking to Grasso, together with the evidence that Grasso was about to enter into competition with Magcobar's dock at an adjoining site, is some evidence from which Magcobar's actual malice can be inferred. Additionally, the jury heard evidence from Gary Shields and Orville Welch of how Magcobar's executives were growing increasingly dissatisfied with the lack of rent being paid at Harbor Island. The jury could have inferred that Magcobar decided to throw Grasso off the dock well before the May 29 meeting. Evidence that Apache had tried unsuccessfully to negotiate with Newpark and Baroid to be fuel supplier, but that Grasso was dealing with these companies, is some evidence from which Apache's actual malice can be inferred.
Magcobar also asserts that the record contains insufficient evidence of actual malice. Having considered and *801 weighed all the evidence in this case, we are unable to determine that the jury finding is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. See Dyson v. Olin Corp., 692 S.W.2d 456, 457 (Tex.1985).
Apache complains of the exemplary damages assessed against it, both as to the amount and as to the award itself. As to amount, the jury heard testimony from two witnesses, John Bagley and Dr. Robert Nash, that Grasso suffered over one million dollars in actual damages. We do not find that the $1,250,000 exemplary damages awarded by the jury was unjustified. See Nabours v. Longview Savings & Loan Association, 700 S.W.2d 901, 904 (Tex. 1985). The award of exemplary damages was predicated on a finding that Apache's interference was done with "actual malice." Having already overruled Apache's "no evidence" point on this finding, we turn to its "insufficient evidence" point.
As we have pointed out, the only evidence tending to support an inference of actual malice was Apache's unsuccessful attempt to negotiate a fuel supply contract with Newpark or Baroid. No other evidence of prior dealings or ill feelings between Grasso and Apache was introduced. In fact, Briggs Beadle and Jerry Susser testified that they harbored no adverse feelings toward Grasso and that they viewed Grasso as a friendly competitor. The jury could have accepted or rejected this testimony, but it simply heard insufficient evidence, on the whole, from which it could have justly inferred actual malice. Compare Top Value Enterprises v. Carlson Marketing Group, 703 S.W.2d 806, 813-14 (Tex.App.El Paso 1986, writ ref'd n.r.e.) (no evidence of tortious interference done with actual malice, merely knowing attempt to induce breach of contract) with Armendariz v. Mora, 553 S.W.2d 400, 407 (Tex.Civ.App.El Paso 1977, writ ref'd n.r.e.) (legally sufficient evidence for jury to infer tortious interference done with actual malice ["spite and revenge"], where plaintiff had twice undercut defendant's contracts and defendant carried out careful plan over several months).
The evidence we have recited regarding Apache's challenge to the "actual malice" finding applies to Apache's contention that no evidence or insufficient evidence exists to support findings of tortious interference with Grasso's business. Apache admitted that it wanted to break into the Harbor Island market, that it knew Grasso had the concession, and that it dealt with Magcobar prior to the May 29 meeting between Magcobar and Grasso. Taking this evidence with evidence that Grasso was successfully expanding where Apache had failed, and with Moxon's description of the suddenly unfriendly attitude of Magocbar at the May 29 meeting, the jury could justly have inferred Apache's interference with Grasso's business. Furthermore, our finding that the alleged six-year oral lease will not support contractual damages against Magcobar does not bar Apache's liability for tortious interference. A third party may not assert the unenforceability of a contract as a defense to an action for tortious interference with its performance. Armendariz v. Mora, 553 S.W.2d 400, 404 (Tex.Civ.App.El Paso 1977, writ ref'd n.r. e.).
Apache and Magcobar also contend that no evidence or insufficient evidence exists to support the jury's finding that Grasso suffered $2,500,000 lost profits. There is some evidence upon which the jury finding could be based. As pointed out in appellee's post-submission brief, the jury could have arrived at lost profits of roughly three million dollars by using the highest of varying figures. For instance, John Bagley testified that sales of up to 700,000 gallons of diesel fuel per month were possible, though this was qualified by saying that some months would have sales below 500,000 gallons. Briggs Beadle, president of Apache, testified that he computed his bid for the Magcobar concession based on expected sales of 600,000 to 700,000 gallons of diesel per month. Additionally, Bagley testified that Grasso's profit margin had reached as high as thirteen-and-one-half cents per gallon, although the average was around ten cents per gallon. Bagley testified to a monthly profit of $4,000 in additional *802 lubricant sales and $33,000 in monthly expenses. Taking the highest figures for these factors, the calculation would run as follows:

700,000 gallons × 13.5 cents = $94,500
profits on lubricants + 4,000
 _______
 $98,500
operating costs -33,000
 _______
 $65,500
reasonable commission found by jury
(.01) × 700,000 gallons -7,000
 _______
 $58,500

Multiplied by the fifty-three months that Grasso was allegedly deprived of its use of Magcobar's dock, from November 1984 through March 1989, the lost profits would have been calculated as $3,100,500. We overrule appellants'"no evidence" point of error.
We also consider the evidence sufficient to support the jury's finding of $2,500,00.00 in lost profits. Briggs Beadle, a man experienced in the industry who had just prepared two unsuccessful bids for similar fuel concessions in the same area, testified that he calculated his bid based on expected sales of 600,000 to 700,000 gallons of diesel sold per month. John Bagley testified that those figures were possible in the area. Testimony was also received that Grasso had had to establish its share of the market, and that its business was growing during the period Bagley used for making his projections. Briggs and Bagley agreed that the standard profit margin for diesel sales was up to twelve cents per gallon. Taking the median figure of 700,000 and multiplying that by twelve cents per gallon, gross profits would be $84,000.00. Adding the $4,000.00 profit margin on lubricant sales testified to by Bagley, total gross profits would be $88,000.00. Subtracting Grasso's projected expenses of $33,000.00, as testified to by Bagley, and the one-cent-per-gallon commission found by the jury of $7,000.00, net profits lost would be $48,000.00. Over fifty-three months, total lost profits would be $2,544,000.00.
Furthermore, Beadle testified that he expected to make an eight-to-twelve-cent profit margin, even after paying Magcobar a two-cent-per-gallon commission. With the jury's finding of one-cent-per-gallon as a reasonable commission, it could have calculated a higher profit margin than that testified to by Beadle and Bagley.
On the other hand, the jury finding is somewhat higher than that testified to by Bagley ($1,484,000.00) and Grasso's expert economist ($635,000.00$1,190,000.00). It is even higher than the figure reached by Apache's witness, Jerry Susser, in Apache's counterclaim for lost profits ($40,000 per month). However, we do not consider the finding, under all of the evidence presented, as being supported by insufficient evidence. A court of appeals may not exercise its fact jurisdiction to set aside a jury verdict where it feels that a different result would be more reasonable. To do so would be to substitute the appellate court's judgment for that of the jury. See Pool v. Ford Motor Co., 715 S.W.2d 629, 633-35 (Tex.1986). We are unable to conclude that the result reached is clearly unjust.
Magcobar and Apache also join in complaining that the trial court erred in denying its motion for new trial based on newly discovered evidence. They assert that Grasso and William DeLay committed a fraud on the court by misrepresenting Delay's true interest in the outcome. Delay was fired by Grasso in January 1984. Magcobar decided not to call DeLay as a live witness at trial. Instead, it introduced DeLay's deposition testimony, in which De-Lay testified favorably to Magcobar on whether a binding agreement had been reached by the parties. Grasso, in its closing argument to the jury, mentioned De-Lay's testimony only to say that DeLay was bitter about being fired. This was in rebuttal to Magcobar's argument concerning DeLay's testimony. Less than a month after trial, DeLay returned to Grasso as president.
We disagree with appellant's contention that a new trial was required because of these circumstances. At the time of the deposition, September 1984, it is undisputed that DeLay was indeed bitter toward his experience with Grasso. Certainly, if he was either contemplating a return to Grasso at the time of trial, or, as contended by *803 appellants, had already decided to return, his bitterness would be less. However, this change of heart would not necessarily have affected the outcome of the trial. De-Lay's testimony would still have favored Magcobar, we must assume. The only difference would be that Grasso could not have made the brief mention in its rebuttal argument to DeLay's bitterness. We do not find that the trial court abused its discretion in overruling the motion for new trial.
Apache contends that the jury's refusal to find favorably to Apache on its counterclaim against Grasso goes against the great weight and preponderance of the evidence. Specifically, the jury answered negatively the issue of whether Apache and Magcobar had a binding contract beginning June 22, 1984, for Apache to act as fuel supplier. A damage issue was conditionally submitted. The jury did not answer it because of its negative answer on the existence of the contract.
The evidence was undisputed that Apache and Magcobar agreed in principle to a fuel concession arrangement on June 22, 1984. However, the evidence was also undisputed that Magcobar did not sign the contract on that date. Further, Gary Shields of Magcobar testified that, after June 22, further changes were to be made so that the Apache-Magcobar contract would dovetail with an Apache-Fina supply contract negotiated after June 27, 1984. In fact, Jerry Susser, Apache's vice-president, himself testified that the Apache-Magcobar contract stated a three-year initial term beginning on September 22, 1984. This evidence is sufficient to support the jury's finding against the Apache counterclaim.
In summary, we hold that, under the evidence presented and the jury findings, Grasso may recover reliance damages from Magcobar, but not from Apache, under its cause of action grounded in estoppel. Grasso may recover lost profits from Magcobar for wrongful eviction, and Grasso may recover lost profits from Apache for tortious interference with contractual relations. Although Grasso is not legally precluded from recovering exemplary damages based on the tort findings against both Magcobar and Apache, the evidence presented was insufficient to support a finding of actual malice against Apache. The evidence was sufficient to support the jury's finding of Magcobar's actual malice.
The portion of the trial court's judgment which awards Grasso exemplary damages against Apache is REVERSED, and Grasso's cause of action against Apache is REMANDED for a new trial. The judgment of the trial court as to Magcobar is AFFIRMED.
NYE, C.J., not participating.
NOTES
[1] This "put-through" commission, as applied to this case, would mean that, for every gallon of diesel fuel Grasso sold to the service boats, or "put through" Magcobar's dock after receiving the fuel from its supplier, Grasso would pay Magcobar a predetermined number of cents.
[2] As mentioned earlier, about June 8, 1984, Grasso and Fina executed a new supply agreement, backdated to May 1, which drastically reduced Grasso's cost of fuel.
[3] SPECIAL ISSUE NO. 13

Do you find from a preponderance of the evidence that any one or more of the Defendants named herein interfered with Grasso's peaceful possession of the premises in question?
A. Magcobar
Answer: "We do" or "We do not".
Answer: We do
B. Apache Fuel & Supply
Answer: "We do" or "We do not".
Answer: We do
If you have answered Special Issue No. 13 "We do", then answer the following issue, otherwise do not answer same.
SPECIAL ISSUE NO. 14
Do you find from a preponderance of the evidence that any one or more of the Defendant's [sic] interference, if any, with Grasso's peaceful possession of the premises in question was done with actual malice?
A. Magcobar
Answer: "We do" or "We do not".
Answer: We do
B. Apache Fuel & Supply
Answer: "We do" or "We do not".
Answer: We do
SPECIAL ISSUE NO. 15
Find from a preponderance of the evidence, what sum of money, if any, that you find would reasonably compensate Grasso for such damages, if any, that may have been suffered by it as a natural and proximate result of Grasso being deprived of its right to occupy, use and enjoy the fuel retail sales facility on the Magcobar Harbor Island premises?
ANSWER SEPARATELY IN DOLLARS AND CENTS, IF ANY, WITH RESPECT TO EACH OF THE FOLLOWING ELEMENTS:
1. Loss of profits, if any which Plaintiff would reasonably have expected to earn from the continued operation of its business on Magcobar's Harbor Island dock from November 6, 1984 to March 31, 1989?
Answer: $2,500,000.00
2. Any damages, other than loss of profits, suffered by Grasso in reliance upon its agreement with Magcobar.
Answer: $150,000.00
[4] That issue read as follows: SPECIAL ISSUE NO. 1 Do you find from a preponderance of the evidence that Grasso and Magcobar, through Lee Williams of Magcobar, agreed to any of the following: ... (emphasis added).

The jury found an agreement on all of the following five points: (A) Grasso would be fuel supplier on Magcobar's dock; (B) Grasso would install a facility at its cost; (C) Grasso would operate from April 1, 1983, to March 31, 1989, coincident with the Fina-Grasso supply contract; (D) Magcobar and Grasso would negotiate a reasonable cent-per-gallon rate when Grasso's operation became profitable; and (E) when a reasonable rate was agreed on, the parties would reduce their arrangement to a written contract.